02-09-369-CV















 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                               NO.
02-09-00369-CV

 

 

IN THE INTEREST OF D.K.W., 

A
CHILD

 

 

                                                       ------------

 

              FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

Appellants
D.W. (Father) and J.S.
(Mother) appeal from the trial court=s
termination of their parental rights to daughter D.K.W.  In one issue, Mother contends that the
evidence is factually insufficient to support the trial court=s
finding that termination of the parent-child relationship between her and D.K.W. is in the child=s
best interest.  In two issues, Father
contends that the evidence is factually insufficient to support the trial court=s
finding of nonpaternity as well as its finding that
termination of the parent-child relationship between Father and D.K.W. is in the child=s
best interest.  Because we hold that the
evidence is factually sufficient to support the trial court=s
best interest findings against Mother and Father and because Father did not
challenge any other grounds for termination except nonpaternity,
we affirm the trial court=s judgment.

I.  Findings

After
a bench trial, the trial court found that Father did not file an admission of
paternity or a counterclaim for paternity or for voluntary paternity to be adjudicated
before the final termination hearing.[2]  The trial court also found that Father had
(1) knowingly placed or knowingly allowed D.K.W. to
remain in conditions or surroundings which endangered her physical or emotional
well-being; (2) had his parent‑child
relationship terminated with respect to another child based on a finding that
his conduct at that time had been in violation of subsection 161.001(1)(D) or
(E) of the Texas Family Code; (3) constructively abandoned D.K.W.
while she was in the permanent or temporary managing conservatorship of Texas
Department of Family and Protective Services (TDFPS)
for not less than six months and:  (a) TDFPS had made reasonable efforts to return D.K.W. to Father, (b) Father had not regularly visited or
maintained significant contact with her, and (c) Father had demonstrated an
inability to provide D.K.W. with a safe environment;
and (4) failed to comply with the provisions of a court order that specifically
established the actions necessary for him to obtain the return of D.K.W.[3]  Finally, the trial court found that
termination of the parent-child relationship between Father and D.K.W. was in D.K.W.=s
best interest.[4]

The
trial court also found that Mother had (1) had her parent‑child
relationship terminated with respect to another child based on a finding that
her conduct at that time had been in violation of subsection 161.001(1)(D) or
(E) of the Texas Family Code; (2) constructively abandoned D.K.W.
while she was in the permanent or temporary managing conservatorship of TDFPS for not less than six months and:  (a) TDFPS had made
reasonable efforts to return D.K.W. to Mother, (b)
Mother had not regularly visited or maintained significant contact with D.K.W., and (c) Mother had demonstrated an inability to
provide D.K.W. with a safe environment; and (3)
failed to comply with the provisions of a court order that specifically
established the actions necessary for Mother to obtain the return of D.K.W.[5]  Finally, the trial court also found that
termination of the parent-child relationship between Mother and D.K.W. was in D.K.W.=s
best interest.[6]

II.  Nonpaternity
Ground

Father
contends in his first issue that the trial court=s
finding of nonpaternity is unsupported by factually
sufficient evidence.  Section 161.002(b)
of the family code allows an alleged father=s
parental rights to be summarily terminated if, among other things, the trial
court finds, as it did here, that Aafter
being served with citation, he does not respond by timely filing an admission
of paternity or a counterclaim for paternity.@[7]  But the State candidly concedes that under
this court=s
precedent, Father=s
admission of paternity in his request for counsel suffices to establish his
paternity.[8]  We agree.

However,
along with a best interest finding, a finding of only one ground alleged under
section 161.001(1) of the family code is sufficient to support a judgment of
termination.[9]  Father does not challenge the trial court=s
findings under subsections (D), (M), (N), and (O).[10]  Accordingly, the trial court=s
error in finding that Father had not admitted paternity is not reversible.  We overrule Father=s
first issue.

III.  Best Interest

In
Mother=s
sole issue, she contends that the evidence is factually insufficient to support
the trial court=s best interest finding
against her.  Father raises the same
challenge in his second issue regarding the trial court=s
best interest finding against him.

A.  Standard of Review

In
reviewing the evidence for factual sufficiency, we must give due deference to
the factfinder=s
findings and not supplant the judgment with our own.[11]  We must determine whether, on the entire
record, a factfinder could reasonably form a firm
conviction or belief that the termination of the parent-child relationship
would be in the best interest of the child.[12]  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could
not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually
insufficient.[13]

There
is a strong presumption that keeping a child with a parent is in the child=s
best interest.[14]  Prompt and permanent placement of the child
in a safe environment is also presumed to be in the child=s
best interest.[15]  The following factors should be considered in
evaluating the parent=s willingness and ability to
provide the child with a safe environment:

(1) the child=s age and physical
and mental vulnerabilities;

 

(2) the frequency
and nature of out‑of‑home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the child;

 

(4) whether the
child has been the victim of repeated harm after the initial report and
intervention by the department or other agency;

 

(5) whether the
child is fearful of living in or returning to the child=s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child=s parents, other
family members, or others who have access to the child=s home;

 

(7) whether there is
a history of abusive or assaultive conduct by the child=s family or others
who have access to the child=s home;

 

(8) whether there is
a history of substance abuse by the child=s family or others who have access to the
child=s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness
and ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness
and ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

 








(12) whether the
child=s family demonstrates
adequate parenting skills, including providing the child and other children
under the family=s care with:

 

(A) minimally
adequate health and nutritional care;

 

(B) care,
nurturance, and appropriate discipline consistent with the child=s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child=s safety;

 

(D) a safe physical
home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F) an understanding
of the child=s needs and
capabilities;  and

 

(13) whether an
adequate social support system consisting of an extended family and friends is
available to the child.[16]

 

Other,
nonexclusive factors that the trier of fact in a
termination case may use in determining the best interest of the child include:

(A)     the desires of the
child;

 

(B)     the emotional and
physical needs of the child now and in the future;

 

(C)     the emotional and
physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody; 

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

 








(F)     the plans for the
child by these individuals or by the agency seeking custody;

 

(G)     the stability of
the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent‑child relationship is not a proper one; and

 

(I)      any excuse for the acts or omissions of
the parent.[17]

 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.[18]  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.[19]  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.[20]

B.  Analysis

The
trial court heard the following evidence. 
L.W., Father and Mother=s
first child, was born in March 2005.  In
July 2005, while the family was living with the paternal grandparents, L.W. was taken to the hospital with severe injuriesCa
fractured skull, broken ribs, a healing fractured leg, and a burn to the
head.  L.W. was
placed with his great-grandmother, and she was named his permanent managing
conservator.  In October 2006, J.W. was born.  He
was removed because of the risk of physical abuse, given L.W.=s
injuries.  Father=s
and Mother=s
parental rights to J.W. were terminated in May 2007.

D.K.W. was
born on June 12, 2008.  Mother admitted
in her testimony that although she took prenatal vitamins and obtained
sonograms with D.K.W., she did not see a doctor
during the pregnancy.  D.K.W. was also removed from her parents soon after her
birth because of the risk of abuse, given the injuries suffered by L.W. in 2005.  After
her removal, D.K.W. was placed with a temporary
possessory conservator, Theresa B., in late July 2008 and remained in that home
at the time of trial, fourteen months later.

D.K.W. had
an eye condition while in Theresa=s
care that required treatment and follow-up visits.  But according to CPS caseworker Holley Brown,
at the time of trial, fifteen-month-old D.K.W. was very
healthy, developmentally on‑target, current on
medical and dental care, and Ajust
a happy, healthy little girl.@

Brown
also testified about the parents=
successes and failures regarding the court-ordered service plans.  She testified that the parents completed
individual counseling, couples counseling, parenting classes, and a
psychological evaluation.  Father
completed anger management classes, and Mother completed domestic violence
classes.

The
parents had housing during the pendency of the case, living in four different
homes in one year.  Brown did not
consider having four different homes in one year to be stable.  At trial, the parents lived with the paternal
grandmother and her husband.  Brown had
visited the home and had no concerns about any dangers stemming from the
physical structure of the house; she admitted that the home was stable.  When L.W. suffered
his severe injuries, he, Mother, and Father were also living in that home.

Father
had told Brown that he was employed, but she did not know where he was working
at the time of trial.  Father and Mother
both testified that Father was unemployed at trial but doing sporadic lawn care
with his stepfather and looking for steady work; Mother testified that she was
not working but was attending school. 
Neither Father nor Mother completed a driving test to obtain a driver=s
license, despite the safety plan requirement.

Brown
testified that the parents did not visit D.K.W. the
required two to three times per week. 
Also, Father did not submit to a random drug test within twenty-four
hours of CPS=s
request, nor did he complete, or even start, Recovery Offering Alternative to
Drugs (ROADS) classes.  Finally, Brown
could not verify whether Mother had completed her MHMR
assessment or whether Father was maintaining a drug‑free
lifestyle.

Mother=s
psychological evaluation indicated that she had depression and anxiety and
recommended a mental health screening. 
Mother knew since March 2009, six months before trial, that she needed
to complete the screening.  Mother
testified that she did not get a screening because she would have had to pay
for it and did not have enough money to do so. 
She admitted that she never went back to MHMR
after Brown told her that CPS would pay for the mental health screening.

On
March 26, 2009, about six months before trial, Father took a hair follicle
test, the results of which caused Brown to be concerned.  On April 2, 2009 and July 8, July 9, and July
10, 2009, Father was asked but failed to take a urinalysis drug test within
twenty-four hours.  On July 13, 2009,
about a year after D.K.W. was removed from the
parents and less than three months before trial, Father took a urinalysis drug
test but admitted then that he had smoked marijuana a month and a half earlier.  Brown testified without objection that Father
tested positive for drugs in 2009, and Father admitted at trial that he had
smoked marijuana two or three months before trial.  Father testified that he did not believe that
he had a drug problem.

Brown
testified that CPS was A[v]ery,
very concerned@
about the lack of consistent visits between the parents and D.K.W.  Beginning in September 2008, the parents were
allowed to visit D.K.W. in Theresa=s
home two times a week for two hours. 
Mother testified that sometime before November 2008, the visits became
tense and stressful.  She said that D.K.W., who cried a lot, would be distracted by Aeveryone
[who] came in and out@ and would want to go to Awho[m]
she remembered instead of@ her parents.  Mother also said that those people would
reach for D.K.W., who would also reach for them.

Mother
claimed that Theresa told Brown that D.K.W.=s
eye condition would Aflare up@
when D.K.W. cried or screamed.  Mother testified that she and Father
therefore Atried
to keep [D.K.W.] from screaming . . . [i]nstead of forcing her to@ go
to them and Ajust
let her ease her way to [them] instead of forcing her to scream all the time.@  Mother also testified that until November
2008, she and Father were visiting D.K.W. twice a
week, at least three or four hours at a time.

Near
Thanksgiving, she and Father had a four-hour unsupervised visit followed on the
same day by a four-hour supervised visit with D.K.W.  Mother said that the visits went fine that day,
but that afterward, when she and Father would call Theresa and leave messages
to set up more visits, Theresa would not call them back.  Mother said that she and Father notified CPS
and that thereafter, they would telephone Brown, who would telephone Theresa
and then let the parents know whether they could go to Theresa=s
house for a visit.

Brown
testified that because the parents were not visiting twice a week for two
hours, but were instead visiting only about three times per month, in January
2009 CPS changed the visitation schedule to one hour per week at the CPS
office.  The parents completed two of
four visits in January 2009.  D.K.W. cried loudly on the first visit, and her parents
were disappointed that she was not attached to them.  Mother said at the time that D.K.W. did not know who Mother was.  In February 2009, the parents visited D.K.W. consistently, and they began to bond.  In March 2009, CPS expanded visits to four
hours per week in anticipation of a monitored return of D.K.W.
to the parents.  Apparently the visits
were changed back to take place at Theresa=s
home instead of the CPS office.  In
mid-March 2009, the parents and Theresa both called Brown.  The parents told Brown that Theresa would not
allow visits; Theresa told Brown that the parents were not visiting.  For whatever reason, no visits occurred until
March 25, 2009, when Brown had a meeting with the parents and Theresa at
Theresa=s
home.  A new visitation schedule was
agreed upon, and the parents visited with D.K.W. that
day.  She cried when Mother held
her.  A week later, at the April 2, 2009
permanency hearing, D.K.W. initially cried when her
parents held her.  The parents complained
to Brown that day that the visits were difficult at Theresa=s
home because she and D.K.W. were attached to each
other.

Brown
tried to set up an alternative schedule thereafter but was unable to reach the
parents.  When she called them on April
27, 2009, she discovered that their telephone had been disconnected.  On June 1, 2009, after not speaking with the
parents since the April 2, 2009 hearing, Brown went to their home but was
unable to see them despite waiting at least twenty-five minutes after a
roommate answered the door.  A few
minutes after Brown left, Father called her.

After
she received the results from Father=s
July 2009 drug test, which were apparently positive, visits were moved back to
the CPS office, and the parents were notified of the change.  Brown tried to reach the parents by telephone
and through relatives from July through August 24, 2009 with no success; on
August 24, she visited their last known residence and discovered that they no
longer lived there.

On
August 25, 2009, Brown learned that Mother had given birth to another baby boy
on July 17, 2009.  At the time of trial,
this baby remained with his parents, and no safety plan had been generated
regarding him.  Mother testified that she
did not tell Brown about the pregnancy because she was worried that CPS would
try to take that baby and not return D.K.W.  The parents visited D.K.W.
on September 3, 2009, after CPS decided not to remove the new baby, and they
visited her once more in September.

On
cross-examination, Brown admitted that Theresa and the parents attend the same
church and that the parents would sometimes see D.K.W.
at church.  But Brown stated that she knew
of only two church visitsCApril 5, 2009 and April 12,
2009.  Theresa also testified that the
parents had visited with D.K.W. at church only twice,
even though all had been in attendance more than that.

In
summary, neither parent visited D.K.W. at all in the
latter half of April or in May, June, July, and August 2009.  Mother testified that she was not quite sure
why she did not attend the visits with D.K.W. at the
CPS office.  She testified that she and Father
did not visit D.K.W. at Theresa=s
house three to four times per week because of transportation problems and
because Father was working.  She also
testified that they did not visit D.K.W. from
mid-April 2009 through the end of August 2009 because of Mother=s
pregnancy, her school and car pool schedule, their jobs, and complications with
Theresa.  Father testified that they did
not visit D.K.W. as often as CPS would like because
of transportation issues, tension with Theresa, and D.K.W.=s
eye issues.  Mother admitted that not
visiting D.K.W. from mid-April 2009 until early
September 2009 hurt the parent-child bond. 
Mother additionally admitted that the absence of the parent-child bond
between D.K.W. and Mother was mostly her fault but
also claimed that Theresa bore partial responsibility.

Theresa
testified that she encouraged the parents to interact more with D.K.W.  Theresa
testified that she brought D.K.W. to court for
various hearings and tried to get the parents to hold her.  Theresa claimed that the parents would not
hold D.K.W. because they did not want to hear her
cry.  At the church visits, Theresa would
let D.K.W. sit with them.

Theresa
testified that she notified the parents of D.K.W.=s
doctor=s
visits so that they could attend. 
Theresa said that the parents attended two appointments but left before
the doctor arrived.  Mother testified
that she was not notified of any of the doctor=s
visits regarding D.K.W.=s
eye condition.

The
parents did provide some financial support to D.K.W.
during the pendency of the case, buying a stroller, car seat, clothes, and
diapers for her, but Brown stated that the financial support was sporadic.  Theresa testified that Mother and Father gave
her thirty dollars at one court appearance, but nothing since that date.

Brown
believed that the parents were not really willing to effect
positive environmental and personal changes, given Father=s
2009 drug use and Mother=s failure to obtain a mental
health screening.  Brown also testified
that she did not believe that D.K.W.=s
parents could meet the child=s
emotional and physical needs because

[j]ust the experience with the parents in this case and the
inconsistencies in visiting a child was just definitely very important.  I cannot positively say that her emotional
needs would be met on a consistent basis and the child definitely needs
structure, stability, and consistency.

 

When asked to describe
Father=s and
Mother=s
parenting skills and abilities, Brown stated, based on the overall visits,

Unfortunately, I don=t really know what
their parenting skills are like.  History
states that they haven=t had custody of any
of the children.  I know that they did
take a parenting class.  I don=t really know what
their parenting skills are like.  . . .

 

. . . .

 

They are appropriate in visits with their
child.  That would be all the evidence
that I would have of their parenting skills.

 

Brown
testified that D.K.W. was not bonded to the parents
and that their attempts to console her when she cried in their arms generally
were unsuccessful.  Brown testified that
termination is in D.K.W.=s
best interest and that TDFPS=s
plan is adoption by Theresa.

Brown
testified that Theresa is very caring, that she maintains D.K.W.=s
medical, dental, emotional, and physical needs, and that Theresa acts like she
is D.K.W.=s
mother and behaves accordingly, appropriately supervising her.  Brown stated that Theresa=s
home is stable and safe.

On
cross-examination, Brown admitted that Theresa had not been considered as a
placement for D.K.W.=s
older brother J.W. because Theresa was involved with
a sex offender when J.W. was removed from his
parents.  Theresa confirmed that a sex
offender had lived with her back then but stated that no sex offenders had
lived with her since D.K.W. had begun living with
her.  Brown testified that she makes at
least two unscheduled visits to Theresa=s
home per month to ensure that she is no longer involved with that sex offender.

When
asked whether she knew that her son-in-law was a sex offender, Theresa denied
any knowledge of that status; she also made clear that while her son-in-law had
been around D.K.W. in her home, he did not play with
the child.  Theresa further testified
that now that she knew that he was a sex offender, she would not allow him to
take care of D.K.W. or to be around her.  Theresa signed a safety plan to that effect
during trial.

Applying
the appropriate standard of review, we cannot conclude that the evidence not
supporting the trial court=s
findings on best interest is so significant that the trial court could not
reasonably have formed a firm belief or conviction in the truth of its
findings.[21]  Accordingly, we hold that the evidence is
factually sufficient to support the trial court=s
findings that termination of the parents=
rights is in D.K.W.=s
best interest.  We overrule Mother=s
sole issue and Father=s second issue.

IV.  Conclusion

Having
overruled both of Father=s
issues and Mother=s sole issue, we affirm the
trial court=s
judgment.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PANEL:  LIVINGSTON, C.J.;
DAUPHINOT and GARDNER, JJ.

 

DELIVERED:  October 7, 2010











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code Ann. ' 161.002(b)(1) (Vernon 2008).





[3]See id. ' 161.001(1)(D), (M), (N), (O) (Vernon 2008).





[4]See id. ' 161.001(2).





[5]See id. ' 161.001(1)(D), (M), (N), (O).





[6]See id. ' 161.001(2).





[7]See id. ' 161.002(b)(1).





[8]See, e.g., In re K.W., 138 S.W.3d 420, 430 (Tex.
App.CFort Worth 2004, pet.
denied); In re D.D.S., No. 02-05-00313-CV,
2006 WL 2309813, at *2 (Tex. App.CFort Worth Aug. 10, 2006, no pet.) (mem. op.).





[9]In re E.M.N., 221 S.W.3d 815, 821 (Tex. App.CFort Worth 2007, no
pet.).





[10]See Tex. Fam. Code. Ann.
' 161.001(1)(D), (M), (N), (O).





[11]In
re H.R.M., 209 S.W.3d 105,
108 (Tex. 2006).





[12]Tex.
Fam. Code Ann. ' 161.001; In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).





[13]H.R.M., 209
S.W.3d at 108.





[14]In
re R.R.,
209 S.W.3d 112, 116 (Tex. 2006).





[15]Tex.
Fam. Code Ann. ' 263.307(a) (Vernon
2008).





[16]Id. ' 263.307(b); R.R.,
209 S.W.3d at 116.





[17]Holley
v. Adams,
544 S.W.2d 367, 371B72 (Tex. 1976).





[18]C.H., 89
S.W.3d at 27.





[19]Id.





[20]Id.





[21]See H.R.M., 209 S.W.3d
at 108.